Ashley M. McDow (245114)
John A. Simon (admitted Pro Hac Vice)
Shane J. Moses (250533)
**FOLEY & LARDNER LLP**
555 S. Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone: 213.972.4500
Email: amcdow@foley.com
          jsimon@foley.com
          smoses@foley.com

Attorneys for Debtors and Debtors in
Possession, SCOOBEEZ, SCOOBEEZ GLOBAL,
INC., and SCOOBUR, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>SCOOBEEZ, et al.[1]<br><br>  Debtors and Debtors in Possession.<br><br>---<br><br>SCOOBEEZ, INC.,<br><br>       Plaintiff,<br>v.<br><br>AMAZON LOGISTICS, INC.,<br><br>       Defendant. | CASE NO. 2:19-bk-14989-WB<br>Jointly Administered:<br>2:19-bk-14991-WB; 2:19-bk-14997-WB<br><br>CHAPTER 11<br><br>ADVERSARY NO. 2:19-ap-01456-WB<br><br>**DEBTORS' NOTICE OF MOTION AND *EMERGENCY* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO PREVENT VIOLATION OF THE AUTOMATIC STAY; DECLARATIONS OF BRIAN WEISS, GEORGE VOSKANIAN, SCOTT SHEIKH, AND ASHLEY MCDOW IN SUPPORT THEROF**<br><br>Hearing:<br>Date: October 28, 2019<br>Time: 2:00 p.m.<br>Place: Courtroom 1375<br>   U.S. Bankruptcy Court<br>   255 East Temple Street<br>   Los Angeles, CA 90012 |

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and Scoobur, LLC (0343). The Debtors' address is 3463 Foothill Boulevard, Glendale, California 91214.

4836-0731-4603.4

**TO THE HONORABLE JULIA BRAND, UNITED STATES BANKRUPTCY JUDGE, AND ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that on October 28, 2019, Plaintiff Scoobeez, Scoobeez Global, Inc., and Scoobur, LLC, the debtors and debtors in possession (collectively "Debtors") in the above-captioned chapter 11 bankruptcy cases (collectively the "Chapter 11 Cases") will move and hereby move (the "Emergency Motion"), pursuant to sections 105(a), and 362 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules of Bankruptcy Procedure 7065-1 and 9075-1 (the "Local Rules"), for entry of a temporary restraining order and a preliminary injunction prohibiting Amazon Logistics, Inc. ("Amazon") from taking actions in violation of the automatic stay.

**PLEASE TAKE FURTHER NOTICE** that by this Emergency Motion, the Debtors seek injunctive relief: (1) prohibiting Amazon from unilaterally terminating  any of its existing contracts with the Debtors (collectively, the "Amazon Contracts"); (2) restoring and maintaining the Debtors with the number of routes assigned to the Debtors prior to Amazon's notification of its intent to terminate the Amazon Contracts in a manner that is consistent with historical business practices between Amazon and the Debtors ; and (3) prohibiting Amazon from contacting employees of the Debtors, whether directly or indirectly, other than as necessary for and historically done in the ordinary course of the conduct of the Amazon Contracts.

**PLEASE TAKE FURTHER NOTICE** that in support of the Emergency Motion, the Debtor relies upon the Declarations of Brian Weiss, George Voskanian, Scott Sheikh, and Ashley McDow appended below, the attached Memorandum of Points and Authorities, all pleadings and papers on file with this Court, and such other evidence, oral or documentary, as may be presented to this Court at or prior to the hearing on the Emergency Motion.

**PLEASE TAKE FURTHER NOTICE** that copies of the Emergency Motion and documents filed in support thereof are available from the Court or upon request to the undersigned counsel.

MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. 2:19-bk-14989-WB

1    **WHEREFORE**, for all the foregoing reasons and the reasons stated in the memorandum

2    of points and authorities, and such additional reasons as may be advanced at or prior to the

3    hearing on the Emergency Motion, the Debtors respectfully request that this Court grant the

4    relief sought in this Emergency Motion and such other relief as is just and proper under the

5    circumstances.

6
7    DATED:  October 25, 2019                    **FOLEY & LARDNER LLP**

8
9
10   Ashley M. McDow

11   Attorneys for Debtors SCOOBEEZ, SCOOBEEZ
     GLOBAL, INC., and SCOOBUR, LLC
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4836-0731-4603.4

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION ................................................................................................... 2

III.    STATEMENT OF FACTS ..................................................................................... 2
        A.      The Amazon Contract and Scoobeez History of Work with Amazon .......... 4
        B.      Amazon's Decision to Terminate and Timeline for Violation of the
                Stay ........................................................................................................... 5

IV.     BASIS FOR RELIEF ............................................................................................ 7
        A.      The Amazon Agreement is Property of the Estate ...................................... 7
        B.      Amazon is Prohibited from Terminating the Contract and/or
                Modifying Contract Terms Without Relief from the Automatic Stay ......... 8
        C.      The Stay Prohibits Function Termination by Eliminating Routes .............. 10
        D.      Amazon's Actions and Threatened Actions Violate the Stay ..................... 10
        E.      The Court Has Authority to Issue a Temporary Restraining Order ........... 11
                1.      The Debtors Will Suffer Irreparable Harm if Amazon
                        Continues to Unilaterally Act ...................................................... 12
                2.      Probability of Success on the Merits ............................................. 13
                3.      The Balance of Hardships Tips Dramatically in the Debtors'
                        Favor ........................................................................................... 14
                4.      A Preliminary Injunction is in the Public Interest ......................... 15
        F.      The Factors to be Considered Under Section 105 Also Strongly
                Support Injunction Relief ........................................................................ 15

V.      CONCLUSION ................................................................................................... 17

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.    INTRODUCTION**

Amazon, the Debtors' *only* customer and source of revenue, has unambiguously indicated its intent to unilaterally (1) terminate the Amazon Contracts with the Debtors, even if the Debtors elect to proceed with a plan of reorganization rather than move forward with the sale of all or substantially all of the assets of the Debtor(s) (a "Sale"); (2) eliminate or reduce Debtors source of revenue by cutting the delivery routes that it pays the Debtors to service (the "Routes"); and (3) directly contact the Debtors' employees in an effort to transfer them to competing delivery providers (presumably with whom they have more favorable contracts) or to their own logistics team.  Moreover, Amazon has unequivocally acknowledged – to the Debtors, the Committee, and Hillair – that the primary reason it has elected to terminate the agreement (whether directly via the thirty (30) day termination right provided for in the most substantive of the Amazon Contracts or indirectly via significantly reducing or eliminating the Routes that it assigns to the Debtors on a moving forward basis) is because the Debtors are unwilling and/or unable to satisfy their pre-petition indemnity obligations despite the fact that the Debtors operational performance has continued to excel from Amazon's perspective (and, in fact, the Debtors have never received higher scores from Amazon than they have in the past four (4) weeks).  Moreover, absent the relief sought by and through this Motion, Amazon's current and ongoing violations of the automatic stay, coupled with their unabashed admission that they intend to take actions perhaps even more violative of the automatic stay, will virtually guarantee that the Debtors will be unable to meet payroll obligations (thus necessitating the layoff of nearly 1,000 employees before the holiday season and potentially creating significant WARN act administrative liabilities for the estates) and destroy any chance that the Debtors have of rehabilitating, whether by way of a Sale or by way of a plan of reorganization, simply so that Amazon can effectively hijack the Debtors' business (which is currently comprised of only its employees and the Amazon Contracts for all intents and purposes) for their own commercial profit in exchange for the payment of a paltry nuisance fee to the Debtors, a notion that could not be more violative of the essence of the bankruptcy process.  Amazon should not be permitted to single-handedly destroy the Debtors

chance at rehabilitation, particularly by and through egregious and flagrant violations of the automatic stay, for its own economic benefit. Accordingly, the Debtors respectfully request, pursuant to 11 U.S.C. 362 and 105(d) that Amazon be enjoined from terminating the Amazon Contracts and be ordered to restore to and maintain with the Debtors with the number of routes assigned to the Debtors prior to Amazon's notification of its intent to terminate the Amazon Contracts in a manner that is consistent with historical business practices between Amazon and the Debtors while the Debtors work diligently towards a value-maximizing exit strategy. During this period, the Debtors will ensure that they continue to perform in the same manner as they have historically – the same performance that has earned them superior scores from Amazon.

## II.     JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. The matter concerns the administration of the bankruptcy estate and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. The adversary proceeding has been brought pursuant to Bankruptcy Rules 7001(7) and the Emergency Motion pursuant to Bankruptcy Rule 7065.

## III.     STATEMENT OF FACTS

The Debtors are a logistics and delivery company that provides logistics and delivery services to Amazon, with operations in Southern California, Illinois and Texas. The Debtors provide "last-mile" delivery solutions, delivering goods by vehicle from merchant distribution points to consumers. These delivery solutions include same-day, next day, and two-day delivery to Amazon customers.

The Debtors employ approximately 1000 employees, with a seasonal increase during the holidays.

On April 30, 2019 (the "Petition Date"), the Debtors each filed a petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Cases. The Debtors continue in possession of their property and operate their businesses as a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On May 13, 2019, the Court entered an order approving the joint administration of the Debtors' cases [Docket. No. 44]. On May 20,

2019, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 Cases.

On June 12, 2019, the Court entered an order appointing Brian Weiss of Force 10 Partners LLC as the Debtors' Chief Restructuring Officer (the "CRO"), after a restructuring of the Debtors' board of directors. The Debtors evaluated and implemented strategies aimed towards preserving and strengthening the Debtors' operations. The Debtors' business is producing positive cash flow. Having stabilized their business, the Debtors embarked on a process to secure a value-maximizing path for the Debtors' business to exit these Chapter 11 Cases.

The Debtors determined, in conjunction with their professionals and in consultation with the Committee, that pursuing a sale or reorganization under Chapter 11 of the Bankruptcy Code provided the best option for the Debtors, their customer base, and their creditor constituents. In connection with this, the Debtors employed Armory Securities, LLC ("Armory") as their investment banker, to market the Debtors' business for a sale or recapitalization.

In order to maximize the value of their business and advance the resolution of the Chapter 11 Cases, the Debtors decided, in their business judgment, after extensive negotiations amongst the Debtors, Hillair and the Committee, to pursue a process pursuant to section 363 of the Bankruptcy Code for the sale (the "Sale") of substantially all of the Debtors' assets to Hillair as a stalking horse purchaser subject to higher and better offers, while preserving a right to seek a recapitalization if revealed as a better alternative during the marketing process. The Committee supported the Sale.

On August 29, 2019, the Debtors filed a motion for approval for sale and bidding procedures in connection with the Sale process [Docket No. 293] (the "Bid Procedures Order"). The Court approved the procedures by an ordered entered on September 17, 2019 [Docket No. 321]. On September 19, 2019, the Debtors filed their motion for approval of the Sale.

Pursuant to the Bid Procedures Order, the deadline for oppositions to the Sale, or to assumption and assignment of contracts in connection with the Sale, was October 1, 2019. Only three oppositions were filed. Two were an opposition to the Sale filed by the former principals

of the Debtors, the Ohanessians, together with a joinder by two other shareholders. The third was an objection filed by Amazon to the assumption and assignment of the Amazon Contract in connection with the Sale [Docket No. 349] (the "Assignment Objection"). The Debtors timely filed their reply to the Assignment Objection [Docket No. 366] (the "Reply to Amazon Objection"). The hearing on the Sale was originally set for October 17, 2019, but has been continued to November 7, 2019.

### A.     <u>The Amazon Contract and Scoobeez History of Work with Amazon</u>

Amazon is the Debtors' only customer, and the entirety of Debtors' revenue derives from payments from Amazon for deliveries from Amazon distribution points to Amazon's customers. The Debtors' contract with Amazon is made up of the Delivery Provider Terms of Service (the "Terms of Service"), which provides the overarching terms of the contract, and the Delivery Provider Terms of Service Work Order (as amended, the "Work Order"), which provides specific locations and pricing terms. The Work Order has been updated by amendment eighteen times, to update pricing and distribution points. The Terms specify that they are "a legally binding agreement between the applicable Amazon Contracting Party or any of its Affliates" and the Debtors. *See* Terms, p. 1.

Pursuant to the Amazon Contract, Amazon pays Scoobeez based on weekly invoices, based on the rates in the current Work Order. See Terms, § 3.a, 4. Amazon generally pays all undisputed amounts within thirty (30) days of receipt of the invoice. Any substantial change in volume or work would therefore have a rapid and direct impact on revenue.

As described above, the Work Order provides the distribution points that Scoobeez will pick up packages from. On a weekly basis, Amazon sends the Routes to Scoobeez. Payments under the Amazon Contract are based on the Routes served, with specific pricing per Route as provided in the Work Order.

Amazon has provided a reliable work flow to Scoobeez over the years. Although there is some seasonal variability, and the Scoobeez model is designed to scale with that variability, Scoobeez has relied on a substantial number of Routes on a consistent basis, and employs more

than 1,000 employees based on that work. Scoobeez has seen a consistent yearly volume, that has increased over time.

Attached as Exhibit A to the Voskanian Declaration chart showing year-over-year total Routes under the Amazon Contract for the current eight-week period, and a comparison of the four months from June through October 2018 and 2019. This shows that overall Routes have been higher in 2019, whereas 2017 and 2018 showed the expected seasonal increase in Routes entering the fall, Routes have taken a sharp downturn in just the past two months. Moreover, since announcing its unequivocal and non-negotiable intention to terminate the Amazon Contracts, Amazon has begun to reduce the number of Routes assigned to the Debtors under the Amazon Contracts.

**B.        Amazon's Decision to Terminate and Timeline for Violation of the Stay**

Amazon has now precipitously decided to terminate its contractual relationship with Scoobeez. This development has occurred suddenly and unexpectedly. Prior to the Debtors filing the Sale Motion, Amazon had not expressed any intention to cease or reduce business with Scoobeez. Rather, Amazon knowingly allowed the Debtors to proceed with a sale process that was based, at least in part, on an expectation of ongoing business with Amazon. Amazon finally raised an objection only when faced with a deadline to object to assumption of the Amazon Contracts. Amazon filed its Assignment Objection on October 1, 2019. Even in the Assignment Objection, Amazon did not indicate or acknowledge that it was categorically unwilling to do business with the Debtors going forward.

Since the filing of the Assignment Objection, however, Amazon has made it clear that it intends to terminate its relationship with the Debtors, irrespective of which path the Debtors choose to take (i.e. a sale or a rehabilitation). This has been communicated both in conference calls in which Amazon, the Debtors, Hillair, and the Committee have participated, and in writing. On October 7, 2019, representatives of the Debtors and Hillair participated in a telephone call with Amazon's representatives. During that call, Amazon's representatives clearly and expressly stated that they did not intend to do business with Scoobeez beyond a brief transition period, and would begin reducing Routes assigned to Scoobeez. Amazon's

1   representative also expressly stated that Amazon would not consent to do business with Hillair or

2   any other buyer of the Scoobeez assets, again beyond a potential brief transition period.

3          On the October 7, 2019 telephone call, Amazon made it clear that its decision was tied to

4   what it viewed as pre-petition defaults by Scoobeez. Amazon's representative cited, as the sole

5   reason provided for its decision to terminate the relationship, that Amazon felt that Scoobeez had

6   not adequately fulfilled its duties to defend and indemnify Amazon from third party claims –

7   claims which arose prior to the Petition Date. Although the Debtors dispute this claim on a

8   substantive basis, as discussed in their Reply to Amazon Objection, the essential point here is

9   that ***Amazon expressly stated that its reason for terminating its relationship with Scoobeez was***

10  ***its belief that Scoobeez had defaulted pre-petition on indemnity obligations under the Amazon***

11  ***Contracts***.

12         On October 16, 2019, counsel for Amazon sent an email to counsel for Hillair, on which

13  Debtors' counsel was copied, expressly spelling out Amazon's position. A true and copy of this

14  email is appended as Exhibit C to the Declaration of Ashley McDow (the "McDow

15  Declaration"), and incorporated herein by reference. Among other things, the email stated that:

16  "Amazon will not continue to do business with Scoobeez, Hillair or a Hillair "Newco" for

17  anything other than a transition period ending on January 6, 2020." The email went on to stay a

18  timeline on which Amazon intended to communicate its decision to drivers, and then terminate

19  the Amazon Contract. While the email suggested a separate agreement, with a modest separation

20  payment by Amazon, it specifically stated that Amazon would proceed on the same timeline

21  regardless of any agreement with the Debtors or Hillair. Amazon also expressly stated that it

22  would begin reducing Routes if a sale is approved, and did not provide any assurance that it

23  would not otherwise reduce Routes under any circumstance.

24         Further, and even more alarmingly, Amazon has expressly stated that it intends to poach

25  the Debtors' employees.  The bullet points in the October 16 email outlining Amazon's plan

26  indicates that Amazon starting on October 25, 2019, Amazon personal will "provide drivers with

27  information on how they can contact other Delivery Service Partners if they are interested in

28  applying for employment with other companies. McDow Decl., Ex C.  While this is set forth a

MOTION FOR TEMPORARY RESTRAINING ORDER
-6-
Case No. 2:19-bk-14989-WB

1  part of Amazon's proposal for a separation agreement, Amazon is clear that this is its plan with

2  or without the Debtors' agreement:

> Assuming that the sale is approved on Oct. 17 and that the transaction closes within a few days thereafter, **Amazon will still operate on the same timeline as laid out above in the 3rd bullet point regarding communication to drivers**, hopefully with the buyer's cooperation to ensure consistent, timely communication to drivers at all stations. **If Amazon does not have the buyer's cooperation, Amazon is still prepared to move forward on the same timeline as laid out above**.

8  McDow Decl., Ex. C (emphasis added).  Amazon could not be more explicit about its intent to

9  contact the Debtors' employees in order to recruit them to competitors, with or without the

10  Debtors consent.

11      Amazon's decision cannot be characterized as the result of any concerns with

12  performance. Scoobeez receives weekly scorecards from Amazon. These have remained very

13  good throughout 2019, with no decrease in performance during the bankruptcy case. In fact, the

14  most recent scorecards extremely high marks across the board. Copies of these most recent

15  scorecards are attached as Exhibit B to the Declaration of Scott Sheikh.  Further, on the October

16  7 telephone call Amazon's representatives specifically stated that Amazon's decision what not

17  based on any issues with Scoobeez's performance.

## IV.    BASIS FOR RELIEF

### A.    <u>The Amazon Agreement is Property of the Estate</u>

20      Property of the estate includes "all legal and equitable interests of the debtor in property

21  as of the commencement of the case."  11 U.S.C. §541(a)(1).  The Legislative history of section

22  541 states that the scope of the paragraph is broad  "[i]t includes all kinds of property, including

23  tangible or intangible property…"  *See In re Computer Communications, Inc.,*  824 F.2d 725,

24  729 (9th Cir. 1987) citing H.R.Rep. No. 595 at 367.  It is well established in the Ninth Circuit

25  that the contract rights of a debtor are property of the estate under section 541.

26      As of the Petition Date, Amazon had not terminated any of the Amazon Contracts that

27  were in existence as of the Petition Date, nor had any of those contracts expired by their own

28  terms and thus they are property of the Debtors' estate.

**B.** **Amazon Has Already Violated The Automatic Stay And Must Be Enjoined From Further Violating the Automatic Stay By Terminating the Contract and/or Modifying Contract Terms Without Relief from the Automatic Stay**

When a debtor files a bankruptcy petition, an automatic stay immediately arises. 11 U.S.C. § 362(a). The automatic stay enjoins the "enforcement of any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. §362(a)(3). "The scope of the stay is quite broad." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585-86 (9th Cir. 1993) *citing Stringer v. Huet (In re Stringer),* 847 F.2d 549, 551 (9th Cir.1988). The automatic stay plays a vital and fundamental role in bankruptcy. *See Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 571 (9th Cir.1992); *In re Medicar Ambulance Co.*, 166 B.R. 918, 925 (Bankr. N.D.Cal. 1994). Congress and the Ninth Circuit Court of Appeals have made it clear that a violation of the automatic stay is a "very serious matter." *In re Achterberg,* 873 B.R. 819, 829 (Bankr. E.D. Ca. 2017).

The automatic stay in combination with other provisions of the Bankruptcy Code provides debtors with a "breathing spell" from creditors so that it can focus its efforts on reorganization. *See Computer Communications, at 729; In re Plumberex Specialty Prods.*, 311 B.R. 511, 556 (Bankr. C.D. Cal. 2004). "It is designed to effect an immediate freeze of the *status quo* by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy fora against the debtor or affecting the property of the estate." *Hillis Motors*, 997 F.2d at 585 *citing Interstate Commerce Comm'n v. Holmes Transp., Inc.,* 931 F.2d 984, 987 (1st Cir.1991), *vacated* 983 F.2d 1122 (1st Cir.1993).

Moreover, executory contracts, like the Amazon Contracts, are protected from termination by the automatic stay. *In re Carroll,* 903 F.2d 1266, 1271 (9th Cir. 1990) (an executory contract that is property of the estate can only be terminated after a grant of relief from stay). Unless an exception applies, the automatic stay prohibits any acts to terminate or modify

1  an estate's interests in a contract.  *In re FirstEnergy Solutions Corp.,* 596 B.R. 631, 636 (Bankr.

2  N.D. Ohio 2019); *see also In re National Environmental Waste Corp.,* 191 B.R. 832, 834 (Bankr.

3  C.D.Cal. 1996) (*"since Ninth Circuit law holds that contract rights constitute property of the*

4  *estate, the City's unilateral termination of Newco's contract is clearly an action exercising*

5  *control over property of the estate"*).

6          Although Amazon may argue that the Amazon Contracts give it the right to terminate at

7  will, the law is clear that this does not allow it to terminate without relief from the automatic

8  stay.  In *In re Ernie Haire Ford, Inc.,* 403 B.R. 750 (Bankr. M.D. Fla. 2009), the bankruptcy

9  court held that a non-debtor counterparty's exercise of a terminable-at-will provision in a

10  contract without stay relief was impermissible and ruled that the contract remained enforceable

11  pending the debtor's decision to assume or reject.  *See Ernie Haire Ford, Inc.,* 403 B.R. at 760-

12  61.  The court expressly found that "rights under the executory contracts are property of the

13  bankruptcy estate, and therefore, exercising terminable-at-will provisions is not permitted

14  without relief from stay." *Id.*  "[W]hile parties may otherwise be permitted to terminate an

15  agreement under state contract law, in bankruptcy, such a termination would be in violation of

16  the stay and the parties must seek permission to the court to act."  *In re Elder-Beerman Stores*,

17  195 B.R. 1019, 1024 (Bankr. S.D. Ohio 1996) (finding that an attempt to terminate by an

18  "essential line" vendor for a retail store debtor was in violation of the stay).

19          Bankruptcy courts throughout the country have consistently found that termination of a

20  contract with a debtor requires relief from the automatic stay.  *See Computer Communications,*

21  824 F.2d at 728 (affirming the bankruptcy court's award of $4.75 million in actual damages and

22  $250,000 in punitive damages for the violation of the automatic stay for unilaterally terminating

23  a contract without first obtaining stay relief and noting that "[e]ven if [d]efendant had a valid

24  reason for terminating the agreement, it was still required to petition the court for relief from stay

25  under §362(d)."); *see also Minoco Group of Cos., Ltd v. First State Underwriters Agency of New*

26  *England Reins. Corp.,* 799 F.2d 517, 519 (9th Cir. 1986) (staying the unilateral right to cancel an

27  insurance policy under section 362).

28

MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. 2:19-bk-14989-WB

### C. The Stay Prohibits Functional Termination by Eliminating Routes, Which Amazon Has Already Done Since Announcing Its Intention To Terminate The Amazon Contracts And The Amazon Relationship

Amazon has taken the position that it could simply eliminate Routes, without expressly terminating the Amazon Contract. This would be a functional termination that would be in violation of the automatic stay. *See In re Ernie Haire Ford, Inc.*, 403 B.R. at 760.

This was expressly addressed by the bankruptcy court in the *In re Ernie Haire Ford* case. The non-debtor party argued that because the contract provided complete discretion to accept or reject loans, they could simply use that discretion to refuse loan applications under the contract, even if they were not permitted to actually terminate the contract without relief from stay. *See In re Ernie Haire Ford, Inc.*, 403 B.R. at 760. This is exactly what Amazon argues in suggesting that it can unilaterally eliminate Routes. The bankruptcy court found that any action that "effectively terminates" the agreement would be a violation of the automatic stay. *Id.*

### D. Amazon's Actions and Threatened Actions Violate the Stay

While termination of the Amazon Agreement for any reason requires relief from stay, termination based on failure to pay pre-petition obligations is expressly forbidden by the stay. Amazon Logistics asserts certain pre-petition defaults under the Amazon Agreement. Any termination of the Amazon Agreement based on those purported defaults is a violation of the automatic stay under bankruptcy code section 362(a)(6). Section 362(a)(6) prohibits any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case. 11 U.S.C. § 362(a)(6).

While the Debtor believes that the Amazon Contract is subjection to assumption and assignment pursuant to Section 356, the automatic stay can be invoked regardless. Amazon has taken the position in the Amazon Objection that the Amazon Contract is not assumable. Although the Debtor strongly disagrees, as set forth in its Reply to the Amazon Objection, Amazon's actions are in violation of the automatic stay regardless. "The Ninth Circuit has specifically held that even where a contract is not assumable, the automatic stay still prohibits the

1   acts enumerated in section 362(a)." *In re Karsh Travel, Inc.*, 87 B.R. at 112, *citing In re*

2   *Computer Communications, Inc.* 824 F.2d 725, 730 (9th Cir. 1987).

3   **E.    The Court Has Authority to Issue a Temporary Restraining Order**

4   Congress vested this Court with the power to "issue any order, process, or judgment that

5   is necessary and appropriate to carry out the provisions of this title" to avoid the grave injustice

6   sought by the Defendants.  11 U.S.C. § 105(a).  The power under section 105(a) is

7   "unambiguously broad," and it grants the court authority not only to enforce specific Bankruptcy

8   Code provisions, but also to "protect the general purpose and intent of the Bankruptcy Code." *In*

9   *re Whitaker*, 341 B.R. 336, 346-47 (S.D. Ga. 2006); *In re Family Health Servs.*, 105 B.R. 937,

10  943 (C.D. Cal. 1989).

11  In determining whether to grant a temporary restraining order or preliminary injunction

12  under section 105(a) in accordance with Bankruptcy Rule 7065, courts consider the following

13  factors: (1) irreparable harm, (2) probable success on the merits, (3) a balance of hardships that

14  tips in the movant's favor, and (4) that a preliminary injunction is in the public interest.[2]  *In re*

15  *Family Health Servs., Inc.*, 105 B.R. at 943 (citing *F.T.C. v. Evans Prods. Co.*, 775 F.2d 1084,

16  1088-89 (9th Cir. 1985)).  Thus, a party is entitled to a preliminary injunction if it can show

17  "either a likelihood of success on the merits and the possibility of irreparable injury, or that

18  serious questions going to the merits were raised and the balance of hardships tips sharply in its

19  favor." *Rubin v. Pringle*, 387 F.3d 1077, 1086 (9th Cir. 2004).  "These two alternatives represent

20  extremes of a single continuum, rather than two separate tests." *Id.*  In evaluating a request for

21  the issuance of a temporary restraining order, courts apply the same standards applicable for the

22  issuance of a preliminary injunction.  *See Simon & Schuster, Inc. v. Advanced Marketing*

23  *Services, Inc.*, 360 B.R. 421, 426 (Bankr. D. Del. 2007) (quoting *Tootsie Roll Industries, Inc. v.*

24  *Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987)).

25

26

27  [2] As the Debtor is seeking issuance of an injunction, no bond is required.  *See* Bankruptcy

28  Rule 7065.

1.    *The Debtors Will Suffer Irreparable Harm if Amazon Continues to Unilaterally Act*

That Amazon's threatened actions will result in both catastrophic and irreparable harm is self-evident.  In general, injury resulting from violation of the automatic stay is irreparable. *See United States Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus., Inc.)*, 68 B.R. 690, 694 (Bankr. S.D.N.Y. 1986) (issuing preliminary injunction ordering defendant to release seized vessels of the debtor).  In addition, as a business, the possibility of going out of business naturally constitutes irreparable harm.  *See John B. Hull, Inc. v. Waterbury Petroleum*, 588 F.2d 24 (2d Cir.1978), cert. denied, 440 U.S. 960 (1979).

The harm here is clear and undeniable.  Amazon has stated that it intends to (1) reduce Routes to zero over a period of some two months at most, (2) contact the Debtors' employees to move them to competitors, and (3) terminate the Amazon Contract altogether.  Amazon is the Debtors' sole customer, and the Debtors rely entirely on revenue from the Amazon Contract to provide cash flow and continue to operate.  Because charges under the Amazon Contract are invoiced weekly and paid within thirty days, the effects of Amazon substantially cutting routes, and/or unilaterally terminating the contract altogether, would be felt almost immediate in revenue.

The Debtors employee approximately 1,000 people, whom it would be almost immediately unable to pay without the revenue from the Amazon Contract.  If Amazon acts as it has threatened and unilaterally stops sending Routes to the Debtors, then the Debtors will be forced to either lay off employees or stop providing them work.  In addition to the obvious human costs, this carries at a minimum a significant risk of WARN act claims.[3]

The inevitable and almost immediate result of Amazon moving forward on its intended, unilateral course is that the Debtors will no longer be able to operate in a matter of weeks, and

---

[3] The Debtors would have defenses, and are not hereby acknowledging or suggesting that the WARN act would apply or that claims would be meritorious, but simply stating that the risk of significant claims being asserted is certainly there.

1    will lose any ability to develop an exit that maximizes value to creditors, whether through the

2    pending Sale in current or modified form, or through any other sale or reorganization.

3           2.    <u>*Probability of Success on the Merits*</u>

4           The probability of success on the merits is high, because Amazon's actions amount to

5    clear violations of the automatic stay.  At the same time, the standard for issuance of a TRO and

6    then Preliminary Injunction does not require the Debtor prove its case for violation of the stay at

7    this time.  All that is required is either "a likelihood of success on the merits," or even that

8    "serious questions going to the merits were raised" as long as the balance of hardships tips in the

9    Debtors favor. *Rubin v. Pringle*, 387 F.3d at 1086.

10          The merits go to whether Amazon's actions or stated intent amounts to a violation of the

11   automatic stay. As set forth above, any action by Amazon to terminate the agreement, or to

12   functionally terminate the agreement by reducing Routes, would violate the stay.

13          Amazon's actions give rise to a right to injunctive relief.  Refusing to do business with

14   the Debtor based on a pre-petition debt or default is a violation of the stay. "It is a clear violation

15   of the automatic stay to refuse to do business with a debtor unless prepetition debt is payed

16   [sic]."  *In re Karsh Travel, Inc.*, 87 B.R. 110, 112 (N.D. Cal. 1988) [internal citations omitted]

17   (*overturned on other grounds*).  In the *Karsh Travel* case, the Northern District Bankruptcy

18   Court issued a preliminary injunction on facts that are very similar to the present situation,

19   prohibiting a large creditor from refusing to honor the terms of their agreement with the Debtor.

20   *Id.*  The Court held that allowing the creditor to refuse to honor the terms of their agreement with

21   the Debtor would be "clearly contrary to congressional intent to place the reorganization of all

22   business except financial institutions in the hands of the bankruptcy courts. *Id. at 111*.  The

23   Court also emphasized that its powers under Section 105(a) could and should be used when

24   necessary to avoid surrendering control of the reorganization to a powerful creditor.  "Although

25   the Court is reluctant to exercise its powers under section 105(a) of the Code except in

26   compelling circumstances, and is mindful that those powers may not be exercised in such a

27   manner as to conflict with the express language of the Code, the Court would have no hesitancy

28

MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. 2:19-bk-14989-WB

1  in invoking those powers if it became necessary in order to avoid surrendering control of travel

2  agency reorganizations to [the creditor]." *Id.*

3          The actions that Amazon appears to be taking by beginning to reduce routes, and those

4  that Amazon has stated that it will take, amount to unambiguous violations of the automatic stay.

5  Amazon expressly stated that its decision to terminate its relationship with the Debtors is based

6  on is assertion of pre-petition defaults with regard to indemnity and defense obligations. *See In*

7  *re Karsh Travel, Inc.*, 87 B.R. at 112 (it is a clear violation of the stay to refuse to do business

8  based on a pre-petition default).  Amazon has also indicated that it will cease to honor the terms

9  of its agreement, and the established pattern of business built over years.

10          In addition, Amazon has stated that it intends poach the Debtors employees, beginning as

11  soon as October 25, by directing them to competing businesses. A creditor seeking to take

12  employees is an absolute violation of the stay.

13          Where Amazon has expressly stated its intent to violate the automatic stay, the Debtors

14  are entitled to declaratory and injunctive relief.  At a minimum, the Debtors have demonstrated a

15  sufficient likelihood of success on the merits for issuance of preliminary injunction relief in order

16  to preserve the status quo. *See In re Roach*, 660 F.2d 1316, 1318 (9th Cir. 1981) (Granting the

17  Debtor a "breathing spell" serves the purpose of the stay and of the Bankruptcy Code).

18              *3.      The Balance of Hardships Tips Dramatically in the Debtors' Favor*

19          As part of exercising its equitable powers regarding preliminary injunctive relief, the

20  court is directed to evaluate the balance of hardships. *In re Family Health Servs., Inc.*, 105 B.R.

21  at 943.  The balance of hardships here is tilted virtually as as far as possible in the Debtors'

22  favor.  On the one hand, as set forth above, the Debtors' ability to keep their doors open and

23  employees employed is at stake for the Debtors. This is an existential issue for the Debtors.

24          On the other side of the balance, it is not clear that there is any hardship at all.  The single

25  reason Amazon has provided for wanting to terminate its relationship with the Debtors is related

26  to an alleged pre-petition default on indemnity obligations.  Amazon has acknowledged that

27  there are no performance issues, and in fact the record is that the Debtors performance has been

28  exemplary.  As the holiday season approaches, Amazon cannot credibly suggest that there is

1   some hardship in continuing, during the term of a preliminary injunction, to provide Routes

2   consistent with past practice.

3                    4.      *A Preliminary Injunction is in the Public Interest*

4          Courts generally find that injunctions that facilitate reorganizations serve the public

5   interest. *In re FiberTower Netword Servs. Corp.*, 482 B.R. 169, 189 (Bankr. N.D. Tex. 2012).

6   "Chapter 11 expresses the public interest of preserving going-concern values of businesses,

7   protecting jobs, ensuring the equal treatment of any payment of creditors, and if possible, saving

8   something for the equity holders. *Id.* Where a debtor's chance for successful reorganization is

9   jeopardized without the requested injunctive relief, such relief serves the public interest. *Id.* at

10  190. *In re Family Health Servs., Inc.*, 105 B.R. at 945 (In the bankruptcy setting the public

11  interest lies in promoting successful reorganization).  Thus, granting the Debtor a "breathing

12  spell" serves the purpose of the stay and of the Bankruptcy Code. In re Roach, 660 F.2d 1316,

13  1318 (9th Cir. 1981).

14         This factor clearly supports issuance of a temporary restraining order and a preliminary

15  injunction to preserve the status quo.  Amazon's sudden change of course without warning

16  threatens to upend any possibility of reorganization, or constructive sale process, at the expense

17  of the Debtors other creditors.  The issuance of a temporary injunction will merely protects estate

18  property and the Debtors ability to move forward with a process that it reasonably determines to

19  be in the best interests of creditors, instead of turning complete control of this case over to

20  Amazon. *See In re FiberTower Netword Servs. Corp.*, 482 B.R. at 189.

21         The Debtors also employ approximately 1,000 people.  The ability to continue to pay

22  these employees relies on continued Routes under the Amazon Contract.  There is a clear and

23  strong public interest in preventing Amazon's unilateral and callous actions from destroying the

24  Debtors' ability to pay these employees in the immediate term.

25  **F.      The Factors to be Considered Under Section 105 Also Strongly**

26  **         Support Injunctive Relief**

27         Although there is no "uniform standard for the merits of a claim for temporary injunctive

28  relief under Section 105(a) in the Chapter 11 context" courts have identified certain relevant

factors. *In re Casner*, 302 B.R. 695, 703-704 (E.D. Cal. 2003). These include: "1. Will the threatened actions interfere with, deplete or adversely affect property of the bankruptcy estate? 2. Will the threatened actions frustrate the statutory bankruptcy scheme? 3. Will the threatened actions interfere with the bankruptcy rehabilitative process? 4. If one or more of the foregoing effects is/are present, is the requested stay reasonable as to scope and duration? 5. If one or more of the foregoing effects is/are present, are appropriate means available to protect the non-debtor party's interests?" *Id.*

As to the first factor, it is well established for all the reasons set forth above that Amazon's actions have already begun to destroy any chance the Debtors have to rehabilitate (whether by and through the Sale or through a plan) and the actions they have made clear that they intend to take will completely destroy those chances.

As to the second factor, Amazon's planned actions would not only frustrate the statutory bankruptcy scheme, but would turn the bankruptcy scheme on its head, by enabling a general unsecured creditor with a contingent, unliquidated, disputed claim based upon a pre-petition indemnity claim to single-handedly deprive the estates of any potential value for their own economic benefit.

As to the third factor, Amazon's actions would not only interfere with the bankruptcy rehabilitative process, but would make the prospect of rehabilitation an unequivocal impossibility.

As to the fourth factor, the Debtors merely ask for perseveration of the status quo for six (6) months in order to determine whether reorganization through a transition to other customers is feasible and carry out that reorganization, or conduct an orderly liquidation over a sufficient time to preserve value and work with employees. Given that Amazon's proposed actions would violate the stay, however, it would be appropriate to enjoin them pending a determination by the Debtors and a ruling by the court on assumption or rejection of the Amazon Contract.

As to the fifth factor, the Debtors submit that Amazon's interests are not harmed by injunctive relief barring a violation of the stay. Amazon has no legitimate interest in violating the stay. In additional, as a practical matter, Amazon's interests are not harmed by limited relief

1    requiring it to continue to provide the same level of seasonally adjusted Routes that it has been

2    providing, given the continued excellent performance of the Debtors.

3

4                              V.    CONCLUSION

5           For all the reasons set forth above, the Debtors respectfully request that the Court (1)

6    enter a temporary restraining order on the terms set forth herein; (2) schedule a hearing on entry

7    of a preliminary injunction; and (3) enter a preliminary injunction to preserve the status quo by

8    requiring Amazon to maintain the current level of Routes, seasonally adjusted, pending the entry

9    of an order for assumption or rejection of the Amazon Contract.

10

11   DATED:  October 25, 2019              **FOLEY & LARDNER LLP**

12

13

14                                        _____
                                          Ashley M. McDow

15                                        Attorneys for Debtors SCOOBEEZ, SCOOBEEZ
                                          GLOBAL, INC., and SCOOBUR, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

4836-0731-4603.4

# DECLARATION OF BRIAN WEISS

I, Brian Weiss, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I am a partner and co-founder at Force Ten Partners, LLC ("Force 10"), which has its principal place office at 20341 SW Birch Street, Newport Beach, CA 92660.  I am the Debtors' Chief Restructuring Officer ("CRO").  I am authorized to make the declaration on behalf of the Debtors.

3.      I am familiar with the history, organization, operations and financial condition of the Debtors.  All facts in this Declaration are based on my personal knowledge, information gathered from my review of relevant documents, and information supplied to me by the Debtors or their professionals.

4.      I make this declaration in support of the Debtor's Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") to which this declaration is annexed.[1]

5.      The Debtors are a logistics and delivery company that provides logistics and delivery services to Amazon, with operations in Southern California, Illinois and Texas.

6.      The Debtors provide "last-mile" delivery solutions, delivering goods by vehicle from merchant distribution points to consumers. These delivery solutions include same-day, next day, and two-day delivery to Amazon customers.

7.      The Debtors employ approximately 1000 employees, with a seasonal increase during the holidays.

8.      Amazon is the Debtors' only customer. Substantially all of the Debtors' revenue derives from payments from Amazon for deliveries from Amazon distribution points to Amazon's customers.

9.      Amazon has now precipitously decided to terminate its contractual relationship with Scoobeez. This development has occurred suddenly and unexpectedly. Prior to the Debtors filing the Sale Motion, Amazon had not expressed any intention to cease or reduce business with Scoobeez.

---

[1]  All capitalized terms used herein shall have the same meaning ascribed in the Motion, unless otherwise stated.

DECLARATION OF B. WEISS ISO MOTION FOR TRO

-1-

Rather, Amazon knowingly allowed the Debtors to proceed with a sale process that was based, at least in part, on an expectation of ongoing business with Amazon.

10. On October 7, 2019, representatives of the Debtors and Hillair participated in a telephone call with Amazon's representatives. I was a participant on the call. During the call, Amazon's representatives clearly and expressly stated that they did not intend to do business with Scoobeez beyond a brief transition period, and would not commit to not reducing Routes assigned to Scoobeez. Amazon's representative also expressly stated that Amazon would not consent to do business with Hillair or any other buyer of the Scoobeez assets, again beyond a potential brief transition period.

11. On the October 7, 2019, telephone call, Amazon made it clear that its decision was tied to what it viewed as pre-petition defaults by Scoobeez. Amazon's representative, Micah McCabe, cited, as the sole reason provided for Amazon's decision to terminate the relationship, that Amazon felt that Scoobeez had not adequately fulfilled its duties to defend and indemnify Amazon from prepetition third party claims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of October, 2019.

_____
BRIAN WEISS
Chief Restructuring Officer for the Debtors

Declaration of B. Weiss ISO Motion for TRO

4829-0319-3514.1

## DECLARATION OF GEORGE VOSKANIAN

I, George Voskanian, hereby declare as follows:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2. I am the Chief Financial Officer and Co-Chief Executive Officer for the Debtors, and, in those capacities, among other, maintain books, records, files and documents relating to the Debtors. As such, I am generally responsible for managing the operations of the Debtors and, thus,am familiar with the Debtors' operations, assets, and liabilities. In the ordinary course of business, I rely on the maintenance of true and correct copies of various documents relating to the Debtors. I have personally worked on books, records, files and documents, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from my business records, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of the Debtors' business at or near the time of the acts, conditions or events to which they related.

3. I make this declaration in support of the Debtor's Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") to which this declaration is annexed.[2]

4. Amazon has provided a reliable work flow to Scoobeez over the years. Although there is some seasonal variability, and Scoobeez model is designed to scale with that variability, Scoobeez has relied on a substantial value of Routes on a consistent basis, and employees more than 1,000 employees based on that work. Scoobeez has seen a consistent yearly volume, that has increased over time.

5. Attached hereto as **Exhibit A** is a true and accurate chart showing year-over-year total Routes under the Amazon Contract for the current eight-week period, and a comparison of the four months from June through October 2018 and 2019.[3] This shows that overall Routes have been higher in 2019, but whereas 2017 and 2018 showed the expected seasonal increase in Routes entering the fall, Routes have taken a sharp downturn in just the past two months. In other words, Amazon is already cutting back Scoobeez's work under the Amazon Contract.

---

[2] All capitalized terms used herein shall have the same meaning ascribed in the Motion, unless otherwise stated.

[3] The October numbers have been normalized to reflect the current partial month.

DECLARATION OF A. MCDOW ISO MOTION FOR TRO

4829-0319-3514.1

6. Historically, Amazon has consistently provided information to Scoobeez as to Routes as follows. Amazon provides monthly projected routes through its online portal for delivery service providers, on a rolling basis. On a weekly basis, Amazon has confirmed Routes for the coming weeks. During the past month, Amazon has ceased to provide consistent advance notice of Routes. Instead, on a given day, Routes for each distribution point have varied substantially from those communicated to Scoobeez in rolling monthly or weekly estimates. This results in either Scoobeez having to pay drivers who are not needed, if the Routes are less than previously communicated, or potentially having to pay Amazon fees for not being able to deliver all Routes, if the Routes on a given day are more than previously communicated. This is a change from the long course of conduct prior to the past month.

7. The inconsistencies in route counts and anxiety created among rank and file employees has caused several key employees to depart. Some employees have raised the issue that Amazon employees are directly saying that Scoobeez is on its way out, therefore, routes will be shaved off overtime. This creates a challenging environment to maintain a quality workforce and keep it engaged. With this said however, Scoobeez has delivered outstanding results for Amazon doing everything possible to incentivize and motivate drivers and local leaders.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of October, 2019.

GEORGE VOSKANIAN
Co-CEO and Chief Financial Officer

4829-0319-3514.1

# DECLARATION OF SCOTT SHEIKH

I, Scott Sheikh, hereby declare as follows:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2. I am the General Counsel and Co-Chief Executive Officer for the Debtors, and, in those capacities, among other, maintain books, records, files and documents relating to the Debtors. As such, I am familiar with the Debtors' operations, assets, and liabilities. In the ordinary course of business, I rely on the maintenance of true and correct copies of various documents relating to the Debtors. I have personally worked on books, records, files and documents, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from my business records, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of the Debtors' business at or near the time of the acts, conditions or events to which they related.

3. I make this declaration in support of the Debtor's Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") to which this declaration is annexed.[4]

4. On October 7, 2019, representatives of the Debtors participated in a telephone call with Amazon's representatives. I was a participant on the call. During the call, Amazon's representatives clearly and expressly stated that they did not intend to do business with Scoobeez beyond a brief transition period, and would begin reducing Routes assigned to Scoobeez. Amazon's representative also expressly stated that Amazon would not consent to do business with Hillair or any other buyer of the Scoobeez assets, again beyond a potential brief transition period.

On the October 7, 2019, telephone call, Amazon made it clear that its decision was tied to what it viewed as pre-petition defaults by Scoobeez. Amazon's representative cited, as the sole reason provided for its decision to terminate the relationship, that Amazon felt that Scoobeez had not adequately fulfilled its duties to defend and indemnify Amazon from third party claims.

---

[4] All capitalized terms used herein shall have the same meaning ascribed in the Motion, unless otherwise stated.

6. During the call, Amazon made no mention that the decision to cease or reduce Routes to the Debtors was the result of any concerns with performance.

7. Scoobeez receives weekly scorecards from Amazon. These have remained very good throughout 2019, with no decrease in performance in recent weeks. The most recent scorecards extremely high marks across the board.

8. True and accurate copies of the most recent scorecards are attached hereto as **Exhibit B**.[5]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of October, 2019.

SCOTT SHEIKH
Co-CEO and General Counsel

---

[5] The names of employees and specific metrics have been redacted to protect confidential employee information and any information regarding the specific metrics used that Amazon might regard as proprietary.

Declaration of A. McDow ISO Motion for TRO

## **DECLARATION OF ASHLEY McDOW**

I, Ashley McDow, hereby declare as follows:

1. I am an attorney duly authorized to practice before the above-referenced court. I am a partner with the law firm of Foley & Lardner LLP, proposed general insolvency counsel for Scoobeez; Scoobeez Global, Inc.; and Scoobur, LLC (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned, jointly administered bankruptcy cases.

2. Unless otherwise stated, I have personal knowledge of the matters set forth herein, and if called as a witness, could and would competently testify to the same.

3. I make this declaration in support of the Debtor's Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") to which this declaration is annexed.[6]

4. Attached hereto as **Exhibit C** is a true and accurate copy of an email that I received on October 16, 2019, from counsel for Amazon.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 24th day of October, 2019.

_____
ASHLEY McDOW

---

[6] The specifics metrics have been redacted to protect any information regarding the specific metrics used that Amazon might regard as proprietary.

# EXHIBIT A



**Scoobeez Total Route Comparison**

Legend: Total 2017 — Total 2018 — Total 2019

| Label | 8.25 - 8.31 | 9.01 - 9.07 | 9.08 - 9.14 | 9.15 - 9.21 | 9.22 - 9.28 | 9.29 - 10.05 | 10.06 - 10.12 | 10.13 - 10.19 |
|---|---|---|---|---|---|---|---|---|
| Total 2017 | 2,067 | 2,087 | 2,139 | 2,130 | 2,127 | 2,156 | 2,169 | 2,029 |
| Total 2018 | 2,238 | 2,221 | 2,268 | 2,258 | 2,395 | 2,415 | 2,462 | 2,333 |



Scoobeez Total Route Comparison

Case 2:19-ap-01250-WB    Doc 2    Filed 10/25/19    Entered 10/25/19 16:14:54    Desc

# EXHIBIT B

# DSP Delivery Excellence Performance

**SCBZ at DSX1**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| **Fantastic** | 1. Attrition Rate | 1 | | Fantastic |
| *See details on next page* | 2. DVCR Compliance | 2 | | Fantastic |
| | 3. Safe Driving Metric | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DPS1**
**Week 42**
**2019**

## Week 42 Performance



| Overall Standing | Key Focus Areas | | Top Drivers |
|---|---|---|---|
| **Great** | 1. Attrition Rate | 1 | Fantastic |
| *See details on next page* | 2. Delivered and Received | 2 | Fantastic |
| | 3. Customer Escalation Defect DPMO | 3 | Fantastic |
| | | 4 | Fantastic |
| | | 5 | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DLA9**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers |
|---|---|---|---|
| **Fantastic** | 1. Delivered and Received | 1 | Fantastic |
| *See details on next page* | 2. Attrition Rate | 2 | Fantastic |
| | 3. DVCR Compliance | 3 | Fantastic |
| | | 4 | Fantastic |
| | | 5 | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DLA8**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers |
|---|---|---|---|
| **Great**<br>*See details on next page* | 1. Attrition Rate<br>2. Delivery Completion Rate<br>3. Delivered and Received | 1<br>2<br>3<br>4<br>5 | Fantastic<br>Fantastic<br>Fantastic<br>Fantastic<br>Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absences from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:      https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DLA3**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| **Fantastic Plus** | 1. Delivery Completion Rate | 1 | | Fantastic |
| | 2. Delivered and Received | 2 | | Fantastic |
| *See details on next page* | 3. Attended Delivery Accuracy | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DDA3**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| Great | 1. Attrition Rate | 1 | | Fantastic |
| | 2. Delivered and Received | 2 | | Fantastic |
| *See details on next page* | 3. DVCR Compliance | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate. The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DDA2**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers |
|---|---|---|---|

**Fantastic Plus**

*See details on next page*

1. Attrition Rate
2. Customer Escalation Defect DPMO
3. DVCR Compliance



| | |
|---|---|
| 1 | Fantastic |
| 2 | Fantastic |
| 3 | Fantastic |
| 4 | Fantastic |
| 5 | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DDA1**
**Week 42**
**2019**

## Week 42 Performance



| Overall Standing | Key Focus Areas | | Top Drivers |
| --- | --- | --- | --- |
| Fantastic | 1. Attrition Rate | 1 | Fantastic |
| *See details on next page* | 2. DVCR Compliance | 2 | Fantastic |
| | 3. Safe Driving Metric | 3 | Fantastic |
| | | 4 | Fantastic |
| | | 5 | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate. The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DCH3**
**Week 42**
**2019**

## Week 42 Performance



| Overall Standing | Key Focus Areas | Top Drivers | |
|---|---|---|---|
| **Fantastic Plus** | 1. Delivered and Received | 1 | Fantastic |
| *See details on next page* | 2. DVCR Compliance | 2 | Fantastic |
| | 3. Safe Driving Metric | 3 | Fantastic |
| | | 4 | Fantastic |
| | | 5 | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:               (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:     https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal          eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DCH2**
**Week 42**
**2019**

## Week 42 Performance

| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| **Fantastic** | 1. Attrition Rate | 1 | | Fantastic |
| *See details on next page* | 2. DVCR Compliance | 2 | | Fantastic |
| | 3. Safe Driving Metric | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:      https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DCH1**
**Week 42**
**2019**

## Week 42 Performance



| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| **Great** | 1. Attrition Rate | 1 | | Fantastic |
| *See details on next page* | 2. Delivered and Received | 2 | | Fantastic |
| | 3. Delivery Completion Rate | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                     (link)
Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible.  Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate.  The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:     https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1  Delivery Excellence Performance Program Guide
2  Delivery Excellence Performance Program Recorded Training Presentation
3  eDriving Mentor Portal        eDriving Support Page
4  Scorecard SOP
5  Metric guide

# DSP Delivery Excellence Performance

**SCBZ at DAU1**
**Week 42**
**2019**

## Week 42 Performance



| Overall Standing | Key Focus Areas | | Top Drivers | |
|---|---|---|---|---|
| Great | 1. Attrition Rate | 1 | | Fantastic |
| See details on next page | 2. Delivered and Received | 2 | | Fantastic |
| | 3. Delivery Completion Rate | 3 | | Fantastic |
| | | 4 | | Fantastic |
| | | 5 | | Fantastic |

## Announcements

### Coming Soon: Attrition Rate Update 10/29

To ensure your Attrition Rate best rewards your efforts engaging and retaining your team, we are excited to announce that we will be updating the Attrition metric based on your feedback. Starting in the 10/29 scorecard, we will begin excluding drivers on extended vacations and leaves of absence from your Attrition Rate. To ensure such leave-of-absences are accurately reflected in your metric, you must report when drivers go on extended vacation or leave by inactivating them on the DSP Portal using the employee decision reasons for "Personal time-off / vacation" or "Medical or maternity leave of absence." See step-by-step instructions on this process in the link below.

See Process for reporting driver vacation/leave:                    (link)

Please note that drivers inactivated for extended vacation or leave who do not return to work will eventually be included in the Attrition Rate. We may require additional documentation of driver statuses to properly audit information. Falsifying driver statuses can permanently disqualify you from the Delivery Excellence Incentive program.

### Compliance Scores: Freshness Update

We strive to make our metrics as current and timely as possible. Starting in WK42, the Comprehensive Audit Score (CAS) will no longer have a one-week lag. Now, if you take action to remediate findings from your audit, the updated score will be vended into the scorecard the same week. You can find details on your Compliance Score in the Compliance Supplementary Report published to the Performance Supplementary Reports section of the DSP Portal.

### Coming Soon: Threshold Update for Customer Escalation DPMO Metric 10/29

Delivering great customer experiences is at the core of what we do every day, and together we continuously strive to be Earth's most customer-centric company. To raise the bar, starting on the 10/29 scorecard we are updating our standards for the Customer Escalation Defect DPMO such that a DPMO of zero (i.e. no customer escalations for the week) is the threshold for 'Fantastic' for this metric. Already nearly a third of DSPs achieve this each week. We recommend you continue to coach your drivers on maintaining good customer experiences. We recognize that visibility into metrics standards is important to you and helps you more effectively coach drivers; we are finalizing a new way to give you more visibility into our standards are looking forward to giving you more details soon.

### Safe Driving Metric and FICO Questions:

The safety of your drivers and community they serve is our top priority.The safe driving metric is calculated using the eDriving FICO score, which helps signal safety of your DA's driving behavior. The metric is measured by analyzing indicators of how your drivers operate their vehicle, such as harsh acceleration, braking, corning, cellphone distraction and speeding while making deliveries. To ensure trips are scored properly, a driver needs to complete both a pre-trip and post-trip DVCR. If drivers have concerns on how an individual trip is captured, they can submit feedback directly in the app on the trip itself so eDriving can investigate. The steps are 1) Open Mentor, 2) Select Trips from options on bottom of screen, 3) Select the trip in question, 4) Select Feedback, 5) Add Comments, 6) Press "Submit Feedback".

DSPs can also report issues or questions to the eDriving support site:    https://www.edriving.com/amazon-dsp-support
Please reference the eDriving FAQs for additional details: (link)

## Resources

1 Delivery Excellence Performance Program Guide
2 Delivery Excellence Performance Program Recorded Training Presentation
3 eDriving Mentor Portal        eDriving Support Page
4 Scorecard SOP
5 Metric guide

# EXHIBIT C

| From: | Esterkin, Richard W. |
|-------|---------------------|
| To: | Friedman, Adam H. |
| Cc: | McDow, Ashley M.; anapolitano@buchalter.com; Simon, John A. |
| Subject: | Scoobeez |
| Date: | Wednesday, October 16, 2019 7:53:29 AM |

## ** EXTERNAL EMAIL MESSAGE **

Adam:

I am writing to ensure that there is no misunderstanding regarding Amazon's position in relation to the sale of the Scoobeez assets to Hillair, or its nominee. We respect that this has come as a surprise to your client, but our goal is to ensure a smooth transition for all parties and want to make sure we are focused on the next steps to ensure that occurs.

- Amazon will not continue to do business with Scoobeez, Hillair or a Hillair "Newco" for anything other than a transition period ending on January 6, 2020.
- Amazon currently has offered $1,100,000 in order to assure a smooth transition of the Scoobeez routes to other DSPs, to mitigate the impact to Scoobeez/Hillair, and to afford the employees of Scoobeez notice and an opportunity to apply for employment with another DSP.
- Assuming that you accept the $1,100,000 offer and sign the separation agreement, we would like to propose the following  next steps:
  - o Scoobeez/Hillair identifies and shares a list of the managers at each Amazon Delivery Station at which it currently operates and who will serve as a partner with Amazon Station Personnel to communicate to drivers.  We expect that the decision to terminate the agreement will stay confidential until October 24.
  - o October 24th: Scoobeez/Hillair communicates the decision to these managers (and only these managers) that Amazon is terminating the agreement effective January 6, 2020.
  - o October 25th: In partnership with Amazon, each appointed Scoobeez/Hillair manager delivers the message to drivers that the agreement has been terminated effective January 6th.  Amazon Station personnel will be present at this meeting to support/answer questions and provide drivers with information on how they can contact other Delivery Service Partners if they are interested in applying for employment with other companies.
        Amazon has a recommended script to use for this communication if you would like help on crafting the communication to drivers.
  - o October 25th, or as soon as reasonably possible, where required, Scoobeez provides WARN notices to its drivers.
  - o January 6th, 2020: Last day of routes in all Amazon Delivery Stations
- Amazon's $1,100,000 offer is its best and final offer. There is no flexibility on the payment amount.
- If we do not have a signed separation agreement in place prior to the Court approving a sale of the Scoobeez assets, the $1,100,000 offer will be withdrawn.  In order to allow us more time to arrive at a signed separation agreement, Amazon would support a continuance of the Oct. 17, 2019 hearing.
- In the event that a sale including an assumption and assignment of the

Amazon/Scoobeez contract is approved by the Court over Amazon's objection, whether or not the sale closes, Amazon will begin reducing Scoobeez's routes.  If the sale does in fact close without a separation agreement, then upon the closing, Amazon will immediately exercise its right to terminate the Amazon/Scoobeez contract.  Assuming that the sale is approved on Oct. 17 and that the transaction closes within a few days thereafter, Amazon will still operate on the same timeline as laid out above in the 3rd bullet point regarding communication to drivers, hopefully with the buyer's cooperation to ensure consistent, timely communication to drivers at all stations.  If Amazon does not have the buyer's cooperation, Amazon is still prepared to move forward on the same timeline as laid out above.

We look forward to arriving at an agreement with Hillair that benefits all parties, as well as the employees of Scoobeez.

Thank you.

**Richard W. Esterkin**
**Morgan, Lewis & Bockius LLP**
300 South Grand Avenue, Twenty-Second Floor | Los Angeles, CA 90071-3132
Direct: +1.213.612.1163 | Main: +1.213.612.2500 | Fax: +1.213.612.2501 | Cell: +1.310.903.2080
Richard.Esterkin@morganlewis.com | www.morganlewis.com
Assistant: Renee Robles | +1.213.612.7321 | Renee.Robles@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.