MORGAN, LEWIS & BOCKIUS LLP
Richard W. Esterkin, SBN 70769
richard.esterkin@morganlewis.com
300 S Grand Ave Fl 22
Los Angeles CA  90071-3132
Tel:    (213) 612-2500
Fax:    (213) 612-2501

Attorneys for
Amazon Logistics, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SCOOBEEZ, et al.[1],<br><br>Debtors and Debtors in Possession. | Case No. 2:19-bk-14989-WB<br>Jointly Administered:<br>2:19-bk-14991-WB, and 2:19-bk-14997-WB<br><br>Chapter 11 |
| SCOOBEEZ, INC.,<br><br>Plaintiff<br><br>v.<br><br>AMAZON LOGISTICS, INC.,<br><br>Defendant. | Adv. No. 2:19-ap-01456-WB<br><br>**AMAZON LOGISTICS, INC.'S SUPPLEMENTAL OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; AND DECLARATION OF JAMES WILSON IN SUPPORT THEREOF**<br><br>Date:    November 18, 2019<br>Time:    10:00 a.m.<br>Place.:    United States Bankruptcy Court<br>Edward Roybal Federal Building<br>255 E Temple St., Ctrm 1375<br>Los Angeles CA  90012 |

Defendant Amazon Logistics, Inc. ("**Amazon Logistics**"), respectfully submits the following supplemental opposition to the Debtor's motion for preliminary injunction:

---

[1] The Debtors and the last four digits of their respective federal taxpayer identification numbers are as follows: Scoobeez (6339); Scoobeez Global, Inc. (9779); and, Scoobur, LLC (0343).  The Debtors' address is 3463 Foothill Boulevard, in Glendale, California  91214.

- 1 -

1.    **Relief Sought:**  The Debtor's motion for a temporary restraining order and preliminary injunction sees three forms of relief:

(a)    "prohibiting Amazon from unilaterally terminating any of its existing contracts with the Debtors …;"

(b)    "restoring and maintaining the Debtors with the number of routes assigned to the Debtors prior to Amazon's notification of its intent to terminate the Amazon contracts that is consistent with historical business practices between Amazon and the Debtors;" and

(c)    "prohibiting Amazon from contacting employees of the Debtors, whether directly or indirectly, other than as necessary for and historically done in the ordinary course of the conduct of the Amazon Contracts."

2.    **Terminating the Amazon Contracts**:  The Amazon Contract provides Amazon (and Scoobeez) with the right to terminate the contract on 30 days' notice, with or without cause.[2] There is no dispute that Amazon may not exercise that right absent relief from the automatic stay. *Computer Communications, Inc. v. Codex Corporation (In re Computer Communications, Inc.)*, 824 F.2d 725 (9th Cir. 1987).  There is no evidence that Amazon has attempted to exercise its termination right, or that it will do so while the automatic stay is in effect.[3]  Indeed, Amazon has sought relief from the automatic stay in order to exercise its termination right.[4]   Because the automatic stay applies to restrain Amazon from exercising its termination right, and because there is no evidence that Amazon intends to violate the automatic stay by exercising its termination right prior to obtaining relief from the automatic stay, there is no cause to issue an injunction

---

[2]  A copy of the Amazon Contract is attached to *Amazon Logistics, Inc.'s Opposition to Application for Temporary Restraining Order and Declarations of James Wilson and Richard W. Esterkin in Support Thereof* (Docket No. 10) at pages 20-175).  The provision in the Amazon Contract providing for the right to terminate the contract is at page 36 ("Either party may terminate these Terms at any time, with or without cause, by providing the other party with 30 days' prior written notice.").

[3]  The October 16, 2019 e-mail upon which the Debtor's motion relies (Docket No. 2 at pages 46-47) states that "If the sale does in fact close without a separation agreement, then upon closing, Amazon will immediately exercise its right to terminate the Amazon/Scoobeez contract."  Once the Debtor has assumed and assigned the Amazon Contract (the relief sought in the sale motion), the Amazon Contract would no longer be property of the Debtor's bankruptcy estate.  As a result, the automatic stay would no longer apply.  11 U.S.C. § 362(c)(1) ("the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;").

[4]  *See,* bankruptcy case Docket No. 393.

- 2 -

precluding Amazon from exercising its termination right. *See, Pester Refining Co.. v. Ins. Co. of North America*, 58 B.R. 189, 192 (Bankr. S.D.N.Y. 1985) (refusing to issue injunction prohibiting insurance company from cancelling insurance policy because such cancellation would violate the automatic stay and, as a result, be void).

3. **"Restoring" Routes**: The Court should decline to enter an injunction regarding the number of routes to be assigned to the Debtor for the following reasons:

(a) The Amazon Contract is clear that the Debtor is not entitled to any particular amount of business, or any business at all. "You acknowledge and agree that Amazon makes no promises or representations whatsoever as to the amount of business that you can expect at any time under these Terms, whether before or after any Work Order becomes binding upon you."[5] Thus, any injunction mandating that Amazon provide the Debtor with any number of routes is contrary to the express terms of the Amazon Contract.

(b) The automatic stay exists to preserve the *status quo*, and does not confer any additional rights upon debtors. *In re Tudor Lodge Associates, LTD Partnership*, 102 B.R. 936, 954 (Bankr. N.J. 1989). Here, the Debtor is attempting to use the automatic stay as a sword to obtain rights that it does not have, not as a shield to prevent Amazon from violating the Debtor's rights. The Debtor has not cited any authority that would permit the Court to enter an injunction expanding the Debtor's contractual rights.

(c) The Debtor's contention that Amazon is *de facto* terminating the Amazon Contract by reducing the number of routes awarded to the Debtor is demonstrably false. Notwithstanding Amazon's desire to sever its relationship with the Debtor, Amazon has continued to provide the Debtor with a substantial number of routes. Indeed based upon the number of routes assigned to it, the Debtor is within the top 5% of all delivery service providers utilized by Amazon.[6]

---

[5] Docket No. 10 at page 31, ¶ 1(c).

[6] Declaration of James Wilson (the "Wilson Decl."). at ¶ 3.

  (d) The Debtor's contention that Amazon is reducing the Debtor's routes based upon the Debtor's bankruptcy filing is also demonstrably false. The average number of routes awarded to Scoobeez in the weeks following its bankruptcy filing exceeds the average number of routes awarded to Scoobeez during 2019 in the weeks prior to its bankruptcy filing.[7]

  (e) The Debtor's contention that Amazon precipitously decided to terminate its relationship with the Debtor at the time that it filed its objection to the assumption and assignment of the Amazon contract with Hillair is also demonstrably false. In fact, in September 2019, Amazon posted on its Route Commitment tool the number of routes, by delivery station, that it anticipated awarding to the Debtor for the remainder of 2019.[8] That model has been updated from time to time since September 2019 and the Debtor has accepted the number of forecasted routes in each iteration, with the most recent iteration being accepted by the Debtor on October 28, 2019.[9] The Debtor has actually serviced routes in excess of the number of routes listed on the Route Commitment tool, as updated, throughout October 2019.[10]

  (f) The Debtor's contention that the recent decline in the number of routes awarded to it presages an attempt by Amazon to engage in a *de facto* termination of the Amazon contract is incorrect. As noted in Amazon's initial objection, the recent decline in the number of routes per week matches a similar decline during the same period of the year in 2017 and 2018.[11]

  (g) Finally, the Debtor's touting its performance as exemplary is simply untrue. Amazon tracks the performance metrics of each of the DSPs operating out of each of its delivery stations.[12] The Debtor's performance metrics from 2019 week 27 through the present as compared to the other DSPs operating out of the stations from which the Debtor operates were as follows:

---

[7] *Id.*

[8] Wilson Decl. at ¶5.

[9] *Id.*

[10] Wilson Decl. at ¶ 6..

[11] Docket No. 2 at page 30.

[12] Wilson Decl., ¶ 7.

| Station | Number of DSPs | Debtor Performance Percentile |
|---|---|---|
| DAU1 | 14 | 63% |
| DCH1 | 17 | 47% |
| DCH2 | 6 | 47% |
| DCH3 | 7 | 56% |
| DDA1 | 11 | 50% |
| DDA2 | 18 | 41% |
| DDA3 | 18 | 70% |
| DLA3 | 6 | 32% |
| DLA8 | 17 | 48% |
| DLA9 | 17 | 50% |
| DPS1 | 18 | 52% |
| DSX1 | 14 | 39% |
| Average | | 49.58% |

The performance reports submitted by the Debtor in support of its motion for a preliminary injunction cover only five of the twelve stations from which the Debtor operates and only one week (week 42) at those stations. Thus, those reports present a misleading "snapshot" of the Debtor's performance metrics.

(h) For the foregoing reasons, there is no basis upon which this Court could issue a mandatory injunction directing Amazon to provide the Debtor with any number of routes. Such an injunction would also be improper for the following reasons:

(i) There is no rational basis for directing Amazon to provide the Debtor with any particular number of routes over any particular time period.

(ii) The Debtor has not demonstrated that it will suffer any irreparable injury. If Amazon were to breach any contractual obligation to the Debtor, and there is no evidence that Amazon intends to do so, such a breach would be compensable in damages.

- 5 -

4. **Communications with Debtor Employees**:

(a) The October 16, 2019 e-mail upon which the Debtor's motion is based is clear that the communications to the Debtor's employees was to be: (i) pursuant to an agreement between Amazon and the Debtor, an agreement that was not concluded and would have to be approved by this Court, and (ii) a joint communication by each of the Debtor and Amazon. There is nothing in the e-mail that even suggests that Amazon intended to contact the Debtor's drivers other than in the ordinary course or in conjunction with the Debtor.

(b) There is no admissible evidence that any Amazon employee has attempted to communicate with the Debtor's employees, other than in the ordinary course. Had such communications taken place, the Debtor should have been able to provide declarations from its drivers establishing that fact, rather than submitted hearsay declarations from its officers.

(c) There is no evidence, admissible or otherwise, that any of the Debtor's drivers have left their employment with the Debtor as a result of any communication that they may have had with Amazon employees.

(d) If the Debtor was truly concerned about communicating to its drivers that Amazon intended to terminate the Amazon Contract, it would not have filed the present proceeding, which provided notice to the world of that fact. Assuming, for purposes of argument, that one or more of the Debtor's 1000 drivers left the Debtor's employ due to concerns about his or her job stability, how is this Court going to determine if that driver obtained knowledge of Amazon's position from some purportedly illicit communication with an Amazon employee or by simply reading the Debtor's own pleadings?

5. **Conclusion**: There is no basis upon which this Court could issue a preliminary injunction.

(a) The automatic stay prohibits Amazon from exercising its right to terminate the Amazon contract on 30 days' notice, Amazon has not threatened to exercise that right in the absence of an order modifying the stay, even if Amazon were to attempt to exercise that right in violation of the stay, the termination would be void, and, if the Debtor thought that it needed any

- 6 -

further relief, the Debtor would have at least 30 days within which to petition this Court for that relief given the requirement to provide at least 30 days' notice of any termination.

      (b)     The parties' contract does not grant the Debtor a right to any particular number of routes, or to any routes at all, and the automatic stay does not enlarge the Debtor's rights. The Debtor is currently being awarded routes that, based upon the number of routes, places the Debtor in the top 5% of all Amazon DSPs. That is hardly a *de facto* termination of the contract. Even if this Court were to conclude somehow that the Debtor had an entitlement to some number of routes in excess of the number of routes provided to it, the Debtor has an adequate remedy at law – damages. Finally, the Debtor has not offered a scintilla of evidence that would enable this Court to dictate the number of routes to which the Debtor is theoretically entitled.

      (c)     The only evidence that Amazon intended to communicate with the Debtor's employees reflects that such communications were to be made with the Debtor's consent and participation. There is no admissible evidence of any "impermissible" communications between Amazon employees and the Debtor's drivers, and no evidence whatsoever that any of the Debtor's drivers have resigned their employment to accept employment with Amazon or a rival DSP.

The Debtor's request for a preliminary injunction should be denied.

Dated: November 11, 2019                                  MORGAN, LEWIS & BOCKIUS LLP

                                                                     By:  */s/ Richard W. Esterkin*
                                                                                   Richard W. Esterkin

                                                                   Attorneys for Amazon Logistics, Inc.

# DECLARATION OF JAMES WILSON

I, James Wilson, declare:

1. My job title is Senior Manager, Amazon Logistics. In that capacity, I am familiar with the engagement of delivery service providers ("DSPs"), such as Scoobeez, Inc. ("Scoobeez"), by Amazon Logistics, Inc. ("Amazon Logistics") to deliver packages ordered from Amazon.com and related online sites.

2. In the ordinary course of its business, Amazon Logistics maintains records regarding the number of routes run by the various DSPs with whom Amazon Logistics contracts. Those records are created and updated at or near the time that the routes are run by the DSP and are relied upon by Amazon Logistics for, among other things, calculating payments due to DSPs. Those records are maintained on a week by week basis, with a week commencing on Sunday and concluding on Saturday. Thus, week 1 during 2019 concluded on January 5, 2019, week 2 concluded on January 12, 2019, etc.

3. Based upon the number of routes run, during weeks 43 and 44, Scoobeez is in the top 5% of all DSPs utilized by Amazon Logistics. Indeed, Amazon has increased the average number of routes awarded to Scoobeez following the filing of its bankruptcy petition above the average number of routes awarded to Scoobeez during 2019 in the months before Scoobeez filed its bankruptcy petition.

4. Amazon estimates the number of packages that will need to be delivered, the number of packages that can fit on a delivery vehicle of varying sizes (i.e. small van, extended van, box truck, etc.), and the type of delivery service required (i.e. standard parcel, secure parcel, pick up, etc.) in order to determine the estimated number of routes by type required from each of its delivery stations. Amazon then communicates the number of routes by type awarded to each of the DSPs over time at each of the delivery stations. Amazon's estimate as to the number of packages that require delivery, the number of packages that fit on a delivery vehicles and the number of routes awarded to each DSP are updated periodically. On September 13, 2019, Amazon launched a web-based Route Commitment tool to communicate the number of routes

awarded to DSPs.  DSPs log into the Route Commitment tool so that, if they elect to do so, they can accept the routes awarded to them or raise questions regarding those route assignments.

5.  The September 13, 2019 version of the Route Commitment tool included the number of routes that that Amazon anticipated awarding to Scoobeez through the remainder of calendar year 2019.  That model has been updated from time to time since September 2019.  Scoobeez has accepted the forecasted number of routes to be awarded to it in each iteration, including the most recent iteration of the assigned routes on October 28, 2019.

6.  Although Amazon attempts to accurately predict the number of packages that will need to be delivered from each of its delivery stations, those estimates are not 100% accurate.  Thus, on occasion, there are excess packages that require delivery and, on occasion, there are fewer packages that require delivery.  In Scoobeez's case, Scoobeez has actually run a substantial number of routes in excess of the Amazon's forecasted allocation in the Route Commitment tool.

7.  In the ordinary course of its business, Amazon Logistics tracks and records the performance metrics of the DSPs with whom Amazon Logistics contracts.  Those records are created and updated at or near the time that the performance metrics are measured and are relied upon by Amazon Logistics for, among other things, determining the identity of the DSPs with whom Amazon Logistics determines to do business.  Scoobeez's performance metrics as compared to the performance metrics of the other DSPs at the delivery stations from which Scoobeez operates, for the period from week 27 of 2019 through the present are as follows:

| Station | Number of DSPs | Debtor Performance Percentile |
|---------|----------------|-------------------------------|
| DAU1    | 14             | 63%                           |
| DCH1    | 17             | 47%                           |
| DCH2    | 6              | 47%                           |
| DCH3    | 7              | 56%                           |
| DDA1    | 11             | 50%                           |
| DDA2    | 18             | 41%                           |
| DDA3    | 18             | 70%                           |

| | | |
|---|---|---|
| DLA3 | 6 | 32% |
| DLA8 | 17 | 48% |
| DLA9 | 17 | 50% |
| DPS1 | 18 | 52% |
| DSX1 | 14 | 39% |
| Average | | 49.58% |

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Cary, North Carolina on November 11, 2019

_____
James Wilson

**CERTIFICATE OF SERVICE FORM**

**FOR ELECTRONIC FILINGS**

I hereby certify that on November 11, 2019, I electronically filed the foregoing document, **Amazon Logistics, Inc.'s Supplemental Opposition to Motion For Preliminary Injunction; and Declaration of James Wilson in Support Thereof** with the Clerk of the United States Bankruptcy Court, Central District of California, Los Angeles Division, using the CM/ECF system, which will send notification of such filing to those parties registered to receive notice on this matter.

*/s/ Renee Robles*
Renee Robles